**IN THE**
**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF ILLINOIS**
**PEORIA DIVISION**

RYAN SPRINGS,
    Plaintiff,

v.

    Case No. 1:24-cv-01440-JEH

MINDI NURSE, et al.,
    Defendants.

**Order**

Plaintiff brought this suit pursuant to 42 U.S.C. § 1983, alleging deliberate indifference to a serious medical need in violation of the Eighth Amendment, specifically a small growth or cyst on his left eyelid and related headaches.

Before the Court are Defendants' summary judgment motions. Docs. 102, 107. Plaintiff has filed a response to each. Docs. 109, 119. And Defendants have filed replies. Docs. 116, 122. For the reasons discussed below, Defendants' summary judgment motions are granted.

**I**

Plaintiff was in prison at Pontiac Correctional Center at all relevant times. UMF 1.[1] Relevant to this lawsuit he was in prison at Pontiac from April 24, 2024, through July 16, 2024. UMF 6.

Defendant Dr. Alford was the medical director at Pontiac, and Hutcheson and McGrath were nurses at Pontiac. UMF 7.

---

[1] "UMF" refers to the individually listed facts in medical Defendants Hutcheson, McGrath, and Alford's summary judgment motion, Doc. 102.

1

Plaintiff alleges that Defendants Hutcheson, McGrath, and Alford exhibited deliberate indifference to his left eyelid cyst and headaches. UMF 3. Plaintiff's eye and headache condition predated his transfer to Pontiac. UMF 4. Plaintiff purports to dispute this fact, asserting that these conditions "were not fully acknowledged at Pontiac," but UMF 4 has nothing to do with anything that happened at Pontiac. Indeed, Plaintiff's Response (Doc. 109) provides the following background regarding his medical conditions: In June 2020 Plaintiff was severely injured, and hospitalized, before he was taken into custody. Doc. 109 at 2, ¶ 1. While at Hill Correctional Center Plaintiff received "extended treatments," including medical and specialist services for macular degeneration, headaches, and a painful cyst which formed in the upper right corner of Plaintiff's left eye. Doc. 109 at 2, ¶ 2. Plaintiff's medical plan was authorized by Hill's medical director and an optometrist. Doc. 109 at 2, ¶ 3. Plaintiff's medical provider, Wexford Health Sources, Inc., approved specialist Bond Eye and Associates to treat Plaintiff. Doc. 109 at 2, ¶ 4. Plaintiff transferred from Hill to Pontiac on April 24, 2024. Doc. 109 at 2, ¶ 5.

Plaintiff asserts that at the time of his transfer from Hill to Pontiac he was scheduled for surgery, corrective vision treatments, injections, medical for headaches, "etc." but he provides no citation to evidence to support this assertion which is therefore disregarded. Local Rule 7.1(D)(2)(b)(5); *Zoretic v. Darge*, 832 F.3d 639, 641 (7th Cir. 2016). Future instances of unsupported assertions are likewise disregarded for the same reason.

Plaintiff's medical records indicate that prior to his transfer to Pontiac he repeatedly refused care for his left eye. UMF 5. Plaintiff asserts without citation to evidence that he never refused care related to his left eye, Doc. 109-1 at 1, but the medical records Defendants cite in their motion plainly note that Plaintiff refused care for his left eyelid issues. Doc. 102-5 at 2, 6, 90. Whether he in fact refused

2

medical care (as opposed to the records being incorrect) is immaterial to the issues before the Court.

Dr. Alford was not responsible for receiving and handling inmates' sick call requests or grievances; rather, he saw inmate patients and reviewed their charts, which were brought to him by other staff or nurses. He was not responsible for scheduling inmate visits to medical or to outside providers or for ensuring their appearance at medical appointments. UMF 8. Plaintiff purports to dispute this fact but provides no applicable evidentiary support. Here, for the first time of many, Plaintiff references Illinois Department of Corrections Administrative Directive 04.03.101, Offender Physical Examinations. Doc. 110-2 at 180-187. AD 04.03.101 does not bear on the issues in this action – it relates to initial intake examinations upon entry into the Illinois Department of Corrections, periodic examinations, and certain chronic disease treatment protocols. Its language does not indicate any applicability to examinations to be performed upon transfer between facilities. And its language does not establish Dr. Alford's job duties as relevant here.

As nurses, McGrath and Hutcheson did not have the ability to diagnose medical conditions or prescribe medications. UMF 9. Plaintiff purports to dispute this fact, however his general citation to these Defendants' declarations (Doc. 110-3 at 510-516) does not substantiate any dispute.[2]

The Health Status Transfer Summary filled out by medical at Hill on April 22 listed a history of headaches and indicated Zyrtec 10mg as the sole current medication; it did not list Tylenol or Motrin. UMF 10, citing Doc. 102-5 at 9. Plaintiff purports to dispute this fact and cites Doc. 110-2 at 31, which is the next

---

[2] Some case participants may have been confused because Plaintiff submitted his summary judgement response exhibits along with a proposed amended complaint, but read in context, and considering his table of exhibits at Doc. 109-2, his summary judgment response exhibits are clearly Doc. 110-1 through 110-3.

page in the medical records, a health status transfer summary completed by Defendant McGrath at Pontiac on April 24. That document indicates in the "subjective" section that Plaintiff told McGrath that he had left eye pain and that he told her he was taking Motrin and Robaxin. *Id.*; UMF 15. McGrath wrote down what Plaintiff told her, but was not required to credit his statements, particularly to the extent they differed from the health transfer form completed at Hill.

On the day he arrived at Pontiac, Plaintiff was seen by Hutchison and McGrath, they examined him, asked questions regarding his medical condition, took vitals, and completed intake paperwork, and as noted immediately above, McGrath documented that Plaintiff reported complaints of left eye pain. In his deposition Plaintiff also testified he told them he was suffering headaches. UMF 11. Plaintiff purports to dispute this fact but does not support his dispute with admissible evidence.

To request medical care at Pontiac, inmates are to submit sick call request slips. UMF 12. Plaintiff purports to dispute this fact again citing the unrelated AD 04.03.101. Prior to being seen by Hutchison and McGrath Plaintiff had not submitted a sick call request slip. UMF 13. Again Plaintiff purports to dispute this fact but does not demonstrate any genuine issue. The purpose of McGrath's visit with Plaintiff on April 24, 2024, was to collect the necessary information to fill out the "receiving facility" portion of the Health Status Transfer Summary, not to treat any specific non-emergency medical condition. UMF 14. Plaintiff purports to dispute this fact, citing a declaration he wrote, Doc. 110-3 at 2-5, but the declaration does not create an issue this fact. On April 24, Nurse McGrath saw the Plaintiff, took his vitals (which were normal), asked questions regarding his medical condition, and completed the "receiving facility" portion of the Health Status Transfer Summary. UMF 15. Again Plaintiff's purported dispute is unsupported. McGrath used her medical judgment at that time to determine that the Plaintiff

4

was not in need of any emergency medical care; McGrath did not have the ability within her scope of practice to diagnose Plaintiff, prescribe medications, or to order that he be provided non-emergency care by medical professionals outside of Pontiac. UMF 16. Plaintiff purports to dispute the fact based on his declaration that her actions were in violation of an administrative directive and his constitutional rights, which is conclusory and not within Plaintiff's personal knowledge and does not create a genuine issue of fact.

On April 24 Hutcheson saw Plaintiff, or reviewed his chart, for the purpose of documenting the medications listed upon Health Status Transfer Summary filled out by medical at Hill, and to fill out the Orientation Screening form. UMF 17. The purpose of Hutcheson's visit with Plaintiff and / or her review of his chart was not to treat any specific non-emergency medical condition. UMF 17. Plaintiff purports to dispute this fact, arguing that "Defendant has already lied about being RN, LPN" and asserts Hutcheson was not authorized to change his medical treatment plan, but neither attack create an issue as to this fact. Hutcheson used her medical judgment at that time to determine that Plaintiff was not in need of any emergency medical care; she did not have the ability within her scope of practice to diagnose Plaintiff, prescribe medications, or to order that he be provided non-emergency care by medical professional outside of Pontiac. UMF 18. Plaintiff again raises a purported dispute, citing his conclusory declaration, which does not in fact create a genuine dispute.

Hutcheson and McGrath then advised the Plaintiff that he should file a sick call request slip if he wished to seek medical care specifically for his left eye and headache conditions as this was the proper way to request medical care at Pontiac. UMF 19. Again Plaintiff's purported dispute fails because he does not provide any material that actually creates an issue of fact.

5

Hutcheson and McGrath did not see or speak with Plaintiff after April 24. UMF 20. They were not involved with Plaintiff's care or requests for care in any way after April 24: They were not asked to see Plaintiff, Plaintiff's care or condition was not brought to their attention, they were not made aware of any medical complaints or requests by Plaintiff, and they were not aware of Plaintiff having any issues seeking or receiving care. UMF 21. Plaintiff purports to dispute this fact but his dispute is, essentially, a statement that he does not know if it is true since he was in prison 24/7, which is insufficient to create an issue of fact.

Plaintiff did not see or speak with Dr. Alford during his incarceration at Pontiac. UMF 22. Plaintiff does not seek to dispute this fact. Defendants assert, "During Plaintiff's relevant incarceration at PCC Dr. Alford was never made aware of Plaintiff nor his medical conditions or requests." UMF 23. Plaintiff disputes this fact, citing Alford's Answer and Affirmative Defenses which admit that Alford "was involved in Plaintiff's care during the relevant time period," while denying that Plaintiff was denied care and denying that the care provided failed to meet the standard of care or constitutional standards. Doc. 30 at 1.

No act or omission on the part of Hutcheson or McGrath caused any improper delay in treatment, undue pain or suffering, degradation of Plaintiff's condition, nor any poor outcome for Plaintiff. UMF 24. Plaintiff purports to dispute this fact but he does not identify any admissible evidence that demonstrates Hutcheson and McGrath's involvement with Plaintiff on April 24, 2024, caused any of these things to occur.

Plaintiff asserts that Defendants were in violation of administrative directives and the Constitution. Doc. 109 at 2-4. The only Administrative Directive he cites in this part of his brief is AD 04.03.101, which as discussed above does not relate to transfers between prisons for individuals already in IDOC custody, and

6

in any case, does not establish constitutional parameters of medical care. His assertion that his constitutional rights were violated is entirely conclusory.

Plaintiff asserts that he repeatedly requested medical care and pain medication and that his medical needs were ignored, Doc. 109 at 4, but he provides no evidence beyond his affidavit in support of these assertions and no specifics in his affidavit as to when or where these purported requests occurred.

Plaintiff also pursues deliberate indifference to a serious medical need claims against IDOC Defendants Pontiac Warden Mindi Nurse and healthcare administrators Ginger Davis and Nikki Rambo. The following facts are from these Defendants' summary judgment motion and Plaintiff's response.

Health Care Unit Administrators (HCUAs) and Directors of Nursing (DONs), including Defendants Davis and Rambo, are administrative functionaries in the prison health care system; they do not provide care to inmates, nor do they determine what care an inmate needs. IDOC-UMF 1.[3] Plaintiff purports to dispute this fact but his blanket citation to twenty-four pages of his affidavits is the only evidentiary support he provides, and those affidavits do not in fact create an identifiable issue here; Plaintiff also appears to agree with the fact based on writing that he "acknowledges" it to be the case. HCUAs and DONs, including Davis and Rambo, do not personally schedule outside appointments for individuals in custody, but rather refer such matters to the medical records director, who coordinates the actual scheduling of appointments. IDOC-UMF 2. Plaintiff again purports to dispute this fact but his blanket citation to over thirty pages of his affidavits does not create a genuine issue as to this fact.

---

[3] "IDOC-UMF" is used to refer to facts listed in IDOC Defendants' summary judgment motion, Doc. 107.

7

When Nurse was informed of issues with Plaintiff receiving care, she investigated those claims and was informed by medical providers that Plaintiff, and not medical staff, was refusing to participate in medical care. IDOC-UMF 3. Plaintiff again seeks to dispute this fact by referencing affidavits that he wrote, but these affidavits again do not establish a genuine dispute as to this fact. Plaintiff repeatedly asserts Warden Nurse lied but stating that conclusion is of no evidentiary value because the affidavits do not include any specifics to demonstrate Plaintiff's personal knowledge regarding what Warden Nurse did or did not do. *See* Doc. 117-1 at 59-62, 117-2 at 21-23. Plaintiff also cites to, and includes a copy of, Judge McDade's Merit Review Order (Doc. 18) in support of his claim, but that document is only a summary of Plaintiff's allegations – it is not admissible now to prove those same allegations are factually true.

When Defendants Davis and Rambo are informed of issues with individuals in custody receiving care, they investigate those claims by discussing them with medical providers, and, as necessary, reviewing medical records. IDOC-UMF 4, 5. Plaintiff purports to dispute these facts by calling Davis and Rambo liars and asserting various non-responsive allegations. Doc. 117 at 21 ¶5-6. Plaintiff does not raise a genuine dispute as to these facts.

To the extent that Defendant Davis was informed of and investigated Plaintiff's claims about being refused medical care, she did not find information in his medical records which supported that claim, but rather the medical providers disputed Plaintiff's claims. IDOC-UMF 6. Plaintiff purports to dispute this fact, but his blanket citation to his entire complaint and proposed amended complaint do not establish a genuine issue as to this fact.

To the extent that Defendant Rambo was informed of and investigated Plaintiff's claims about being refused medical care, she did not find information in his medical records which supported that claim, but rather the medical providers

disputed Plaintiffs claims. IDOC-UMF 7. Plaintiff purports to dispute this fact by citing again to affidavits that are entirely conclusory, lack any indication of dates or times of the occurrences alleged therein, and again acknowledge that Rambo may well have not known about his situation but should be held responsible based on her supervisory role within the healthcare system. Doc. 117-1 at 17. There is no genuine dispute as to IDOC-UMF 7.

Defendants Nurse and Rambo seek to aver that no act or omission on their part caused any improper delay in treatment, undue pain or suffering, degradation of Plaintiff's condition, or any poor outcome for Plaintiff, but they do not establish a basis for their conclusory statement so IDOC-UMF 9-10 are not facts properly before the Court. At the same time, though Plaintiff purports to dispute these facts by calling Nurse and Rambo liars and asserting that their actions or inactions did in fact cause pain and suffering and prolonged a scheduled surgery, his affidavits are again a regurgitation of his allegations and do not indicate with any specificity how anything these Defendants did or did not do impacted him, aside from asserting he continued suffering from headaches during this period.

The IDOC Defendants UMF 10, 11, 12, and 14 are covered earlier in the facts recited above regarding Plaintiff's medical condition and care prior to his transfer.

Plaintiff refused mandatory care while at Pontiac – specifically a TB skin test attempted on June 6, 2024. IDOC-UMF 13. Plaintiff's purported dispute fails to raise a genuine issue as to this fact.

Plaintiff purchased a number of items from the commissary at Pontiac, but his memory failed him during his deposition as to whether ibuprofen or Tylenol were available at the commissary. Doc. 107-7 at 32:3-14.

To the extent Plaintiff attempts to provide any additional material facts in response to the IDOC Defendants' summary judgment motion they are unsupported by citation to admissible evidence. Plaintiff sometimes cites to the

9

many affidavits he authored but those affidavits are recitations of his allegations as to matters that he has not established personal knowledge of or are otherwise so non-specific as to lack any evidentiary value.

Plaintiff was ultimately seen at Marion Eye Center in January 2025, after he was transferred to Lawrence Correctional Center, and he described the condition to the provider there as "annoying," said it had existed for years, and that physician's plan was to monitor the ongoing development of the 6 – 7 mm growth and for Plaintiff to take ibuprofen as needed. 107-5 at 43-47.

## II

## A

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In ruling on a motion for summary judgment, a district court "has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). In making this determination, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010).

"The Eighth Amendment's prohibition against cruel and unusual punishment imposes a duty on the states, through the Fourteenth Amendment, 'to provide adequate medical care to incarcerated individuals.'" *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "Prison officials can be liable for violating the Eighth Amendment when they display deliberate indifference towards an objectively serious medical need." *Thomas v. Blackard*, 2 F.4th 716, 721–22 (7th Cir. 2021). "Thus, to prevail on a

deliberate indifference claim, a plaintiff must show '(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'" *Dominguez*, 5 F.4th at 824 (citing *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016)).

"To be 'serious,' a medical condition must be one that a physician has diagnosed as needing treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Knight v. Wiseman*, 590 F.3d 458, 463 (7th Cir. 2009) (quotation omitted). "To show deliberate indifference, the plaintiff must demonstrate that the defendant was actually aware of a serious medical need but then was deliberately indifferent to it. Deliberate indifference requires a showing of more than mere or gross negligence, but less than purposeful infliction of harm." *Id.*

**B**

First, there is insufficient evidence from which a reasonable jury could conclude that that Plaintiff suffered from a serious medical need. Plaintiff alleges a cyst or growth on his left eyelid caused him headaches. That cyst was entirely unrelated to Plaintiff's vision loss which was caused by an assault in 2020 before Plaintiff was in custody. Common ailments such as headaches are generally insufficient to reach the level of an objectively serious medical need. *See Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999); *Willis v. Pfister*, No. 18-CV-333, 2024 WL 216672, at *10 (N.D. Ill. Jan. 19, 2024). Plaintiff described varying levels of pain from this condition, and while pain can be difficult to assess, the record does not indicate severe or debilitating pain. Plaintiff later described his condition as merely an "annoying" condition he had been dealing with for years and was at that point prescribed ibuprofen.

Defendants are entitled to judgment as a matter of law because Plaintiff has not put forth evidence from which any reasonable jury could determine that he

11

suffered from an objectively serious medical need, such that any delay in treatment could rise to the level of cruel and unusual punishment under the Eighth Amendment.

Second, even if a jury could determine that Plaintiff's headache and eyelid growth were objectively serious medical conditions, no reasonable jury could determine that any Defendant sued here was deliberately indifferent to it.

As to the medical defendants, Nurses Sarah Hutcheson and Rebekah McGrath saw Plaintiff on one occasion – April 24, 2024. The purpose was Plaintiff's immediate assessment upon transferring to Pontiac from Hill. Though Plaintiff repeatedly argues – without any specifics and without citation to any prescription or other medical records – that he was receiving prescription Tylenol and Robaxin at Hill, and that he had outside eye appointments scheduled at the time he left Hill, the record does not substantiate or support those assertions. The transfer summary from Hill did not mention any outstanding medical writs or specialist appointments, nor did it indicate any medication aside from Zyrtec, an allergy medication, which Plaintiff does not assert that he was denied. There is no indication that Plaintiff required emergency or urgent care on April 24, and Hutcheson and McGrath had nothing to do with Plaintiff's care after that date. These two nurses told Plaintiff how to request medical care for his non-urgent condition. No reasonable jury could find either to have exhibited deliberate indifference to Plaintiff's medical needs, to the extent such needs could be determined to be objectively serious.

Plaintiff's claim against Dr. Alford presents an interesting situation: Alford admitted in his answer that he was "involved" with Plaintiff's care, but aside from that admission, there is no shred of evidence that Alford knew about, much less failed to properly address, Plaintiff's medical needs. To prove liability, there must be evidence of record to demonstrate personal involvement with improper or

insufficient medical treatment of the plaintiff, and also evidence to support a finding that the medical provider acted with a mental state bordering on complete disregard for the plaintiff's medical needs. No reasonable jury could construe Alford's bare admission of "involvement" in Plaintiff's care to find him to have violated Plaintiff's constitutional rights. Aside from that single broad admission of involvement there is nothing in the record about anything Alford did or did not do. So, while Plaintiff has won on the evidentiary battle of preserving Alford's admission, he must lose the claim for want of evidence that Alford did or did not do anything with a sufficiently culpable mental state to warrant imposition of Eighth Amendment liability.

Finally, Plaintiff's claims also fail as to the IDOC Defendants, Nurse, Davis, and Rambo, on the issue of deliberate indifference, again in the alternative to the Court's finding that Plaintiff did not suffer an objectively serious medical need.

Warden Nurse is not a medical professional, and as such, unless Plaintiff's medical need would have been obvious to a lay person, she is entitled to defer to the medical professionals' reports regarding Plaintiff's care. *Greeno v. Daley*, 414 F.3d 645, 655 (7th Cir. 2005) (declining to hold complaint examiner liable for failing to "remedy the medical defendants' failure to provide appropriate treatment"); *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009) (stating that wardens and grievance officers are "entitled to relegate to the prison's medical staff the provision of good medical care"). Rather than exhibit deliberate indifference to Plaintiff's complaints the record demonstrates that Nurse investigated those complaints, including by speaking to medical providers who reported Plaintiff had been refusing to engage in receiving medical care. Plaintiff was then transferred to another facility, at which point Nurse had no power to further resolve his medical concerns.

As to Davis and Rambo, the record is devoid of detail regarding when or how either were placed on notice of Plaintiff's condition, much less that they acted with deliberate indifference to his situation. Plaintiff broadly alleges that they should have known based on their involvement with healthcare at Pontiac, and generally asserts that at some unspecified time and location he spoke to Davis, relating that he was not receiving treatment. This record is insufficient for any reasonable jury to find these Defendants acted with deliberate indifference to a serious medical need. There is a record of Plaintiff's chronic eye growth condition stretching back some years prior to his transfer to Pontiac, a history of medical records from Hill noting Plaintiff refusal to attend medical appointments, including specialist appointments related to his eye, and a generalized assertion by Plaintiff that by being employed in the healthcare department at Pontiac, Davis and Rambo could be found liable for violating his constitutional rights. No reasonable jury could so find.

A final note as to Plaintiff's arguments about the impact of prison policies on the merits of Plaintiff's claims. Plaintiff discusses the contents of various IDOC Administrative Directives at length and asserts that Defendants failed to follow those internal IDOC protocols and policies. Those policies and directives do not appear applicable to Plaintiff's situation: AD 04.03.101 on its face relates to intake into the IDOC rather than protocols for transfer between facilities. Plaintiff makes an argument about an assessment he believes he should have undergone pursuant to policies related to his approval to be a food handler within the prison – but that entry and those policies are entirely divorced from the facts of this case and Plaintiff's eye and headache condition. Where none of the policies at issue are clearly applicable to Plaintiff's medical care for his eye cyst and headaches, they do not create a reasonable inference that Defendants violated his constitutional rights regarding these conditions.

Finally, the IDOC Defendants assert they are entitled to qualified immunity. But since all Defendants are entitled to summary judgment on the merits as discussed above, that analysis is unnecessary.

**III**

For the reasons set forth above, Defendants' summary judgment motions [102], [107] are GRANTED.

*It is so ordered.*

Entered: July 22, 2026

s/Jonathan E. Hawley
U.S. District Judge